IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Alliance for the Wild Rockies et al.,<br><br>Plaintiffs,<br>v.<br><br>Angelita Bulletts et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER AFFIRMING UNITED STATES FOREST SERVICE'S ACTION AND DISMISSING CASE<br><br>Case No. 2:13-CV-0715 BCW<br><br>Magistrate Judge Brooke Wells |

The instant case is a Petition for Review of Agency Action, brought by Alliance for the Wild Rockies & Native Ecosystems Council regarding the United States Forest Service's ("FS") decision as to the Iron Springs Project ("Project"). The Project will occur within the Escalante Ranger District on the Dixie National Forest ("DNF") in Southern Utah. The DNF, and the Project area, provide habitat for many species of wildlife, including some sensitive and Endangered Species Act listed species. Animals that can be found within the Project area include mule deer, elk, the threatened Utah prairie dog, the Mexican spotted owl, and numerous kinds of birds including the flicker, the goshawk, and perhaps the three-toed woodpecker.[1]

Some of these species, such as the northern goshawk and the three-toed woodpecker are dependent upon old growth and old forest ecosystems as they nest in the hollow cavity of dead and dying trees, which are called "snags." Plaintiffs oppose the Project for a number of reasons, including that the Project would result in fewer snags and less old growth habitat for these creatures. Plaintiffs bring suit because they believe that logging and road building activities

[1] It is unclear whether there are currently any three-toed woodpeckers residing in the Project area. Administrative Record ("AR") at 14771–84 (survey inventories conducted in the Project area in 2012).

authorized under the Project threaten the forest habitat and these species and believe the FS did not comply with several federal laws in approving the Project.

Defendants, however, argue that the Project is necessary because the Project area is undergoing a beetle outbreak. The beetle outbreak has resulted in an influx of dead and dying timber—both standing and on the forest floor—leaving the Project area at a high risk of catastrophic fire. Defendants argue that if the FS were to do nothing, the forest would remain overstocked, aspen would continue to be overtaken by conifers, and the forest would remain susceptible to spruce beetles and disease.[2] In addition, the area would remain at risk of a catastrophic fire.

Plaintiffs bring claims under the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA") and the Administrative Procedure Act ("APA"). Plaintiffs argue that the FS's decision to prepare an Environmental Assessment ("EA"), Decision Notice ("DN"), and Finding of No Significant Impact ("FONSI") was arbitrary and capricious. Plaintiffs further argue that the agency was instead required under NEPA to prepare an Environment Impact Statement ("EIS"). Plaintiffs also argue that the FS violated NEPA by failing to evaluate the environmental consequences of the Project especially as it relates to the Utah Northern Goshawk Amendment and the DNF Forest Plan. Finally, Plaintiffs argue that the Project violates NFMA because it is inconsistent with the DNF Forest Plan.

The case is assigned to Magistrate Judge Wells by consent of the parties.[3] The Court heard argument on July 2, 2014, and took the matter under advisement.[4] The administrative record in this case is voluminous and contains more than 35,000 pages of material.[5] The Court

---

[2] *Id.* at 33224.
[3] Docket no. 15.
[4] Docket no. 38.
[5] Docket no. 20.

has now further considered the administrative record in this case, the relevant case law, and the facts related to this appeal. For the reasons set forth more fully below, the Court AFFIRMS the FS's action in approving the Project and instructs the Clerk of Court to dismiss this case.

## BACKGROUND

### 1. THE PROJECT

The Project at issue is a vegetation improvement and salvage project implemented within the Aquarius Plateau, at elevations ranging from 9,000 to 10,750 feet in elevation in the DNF.[6] The Project involves a range of vegetation improvement actions including intermediate harvest treatments, salvage of timber killed by or dying as a result of beetle infestation, regeneration of aspen, and reforestation of previously harvested areas.[7] The FS concluded that the Project was needed because:

> (1) spruce/fir stand density is higher than desirable and age class diversity is lower than desired; (2) spruce/fir stocking is low in historic clearcut areas; (3) spruce/fir stands are susceptible to mortality by spruce beetle; (4) 80 percent of the aspen is in the mature to over-mature class, with the bulk of the aspen being greater than 80 years old; (5) most of the aspen clones are succeeding to spruce/fir and are at risk of being replaced by conifer; and (6) due to high stand densities and extensive downed material, both large and fine fuel loadings are above desired levels, creating a risk of catastrophic fire.[8]

As part of the Project, the FS authorized commercial logging to occur on 3,603 acres of spruce/fir, of which 381 acres would be pre-commercially thinned.[9] In addition, approximately 152 acres of aspen will receive regeneration treatment and approximately 388 acres of aspen will receive cleaning in aspen stands.[10] Additionally, approximately 366 acres in the spruce/fir stands are at the desired density, therefore these 366 acres would receive commercial

---

[6] AR, at 33206–07.
[7] *Id.*
[8] *Id.* at 32911.
[9] *Id.* at 33210–11.
[10] *Id.*

sanitation/salvage treatment only.[11]  Finally, approximately 154 acres would be planted with Engelmann spruce seedlings as the area does not contain desired tree stocking.[12]

The Project involves the use of approximately 36.16 miles of existing FS roads and includes re-routing 200 feet of a forest road to prevent resource damage.[13]  The Project also requires the construction of 9.61 miles of new temporary roads.  The new roads would be decommissioned at the conclusion of the Project.[14]

## 2.     LEGAL FRAMEWORK

### A.     NEPA

Generally, NEPA subjects all federal land management agencies to certain environmental assessment and planning requirements.  NEPA forces federal agencies to incorporate environmental considerations into decision-making processes and in delaying projects in which environmental assessment has been superficial.

NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."[15]  Under NEPA requirements, if an agency is uncertain whether a proposed action will significantly affect the environment, the agency may prepare an EA, providing sufficient evidence and analysis to determine significant environmental effects; if environmental effects are significant, the agency must then develop an EIS, which is considerably more detailed than the EA, but if not significant, the EA results in a FONSI, and no further agency action is required to pursue the project.[16]

---

[11] *Id.* at 33210.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 33212.
[15] 42 U.S.C. § 4332(2)(C).
[16] *See* 42. U.S.C. § 4321; *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 256 (D. N.H. 2008).

"Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action."[17] To that end, NEPA imposes only procedural requirements and "does not mandate any particular substantive outcome."[18]

**B. NFMA**

The NFMA provides for forest planning at two levels: the forest level and the individual project level.[19] First, the FS prepares a land and resource management plan ("Forest Plan").[20] Next, the FS implements the Forest Plan by approving or disallowing specific projects. These projects must be consistent with the governing Forest Plan.[21] The FS's interpretation of its governing Forest Plan should receive "great deference" from reviewing courts."[22] The NFMA requires the Secretary of Agriculture to issue regulations that set out the process for the development and revision of forest plans.[23] This project arises under the Dixie Forest Plan. The DNF Forest Plan was adopted in 1986 and has undergone numerous subsequent amendments, including the 2000 Goshawk Amendment.[24]

**C. APA**

Because neither NEPA nor NFMA provides a private right of action, federal courts review claims that the FS violated these statutes under the APA. Under Section 706 of the APA, this court must determine, based on the record before the FS, whether the DN or FONSI is

---

[17] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).
[18] *Citizens' Comm. To Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002).
[19] *See* 16 U.S.C. § 1604.
[20] 16 U.S.C. § 1604; *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006).
[21] *See* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").
[22] *Lamb v. Thompson*, 265 F.3d 1038, 1047 (10th Cir. 2001).
[23] *See* 16 U.S.C. § 1604(g)(3)(B).
[24] AR at 3965, 32915.

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[25] In applying the arbitrary and capricious standard, the court must determine whether the agency has "considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[26] The court cannot substitute its own judgment for that of the FS.[27] A decision is arbitrary and capricious if "the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[28]

In reviewing the adequacy of an EA or EIS, courts are only permitted to ensure that the required process was followed. "The requirements of NEPA . . . apply to procedure and do not undertake to control decision making."[29] "Once an agency has made a decision subject to [NEPA]'s procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of action to be taken."[30] Under Tenth Circuit law, the role of the Court "is limited to a determination of whether the statement is a good faith, objective, and reasonable presentation of the subject areas mandated by NEPA."[31] Therefore, "if the Court

---

[25] 5 U.S.C. § 706(2)(A); *see also Utah Environmental Congress v. Zeiroth*, 190 F. Supp. 2d 1265, 1267–68 (D. Utah 2002).
[26] *Penobscot Air Servs., Ltd. v. Federal Aviation Admin*, 164 F.3d 713, 719 (1st Cir. 1999).
[27] *Id.*
[28] *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).
[29] *Environmental Defense Fund v. Andrus*, 619 F.2d 1368, 1374 (10th Cir. 1980).
[30] *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980).
[31] *Sierra Club v. Stamm*, 507 F.2d 788, 793 (10th Cir. 1974).

finds that the agency's decision is supported by the facts in the record, and is not contrary to law, the Court should affirm the agency's decision."[32]

## ANALYSIS

### 1. The Preparation of an EA instead of an EIS Was Not Arbitrary and Capricious.

Plaintiffs assert three claims for relief. First, Plaintiffs argue that the FS violated NEPA by failing to prepare an EIS for the Project. NEPA requires agencies to take a "hard look" at the potential environmental consequences of a proposed action.[33] As part of its "hard look" mandate, NEPA directs federal agencies to prepare a detailed EIS for federal actions that may significantly affect the quality of the human environment.[34] In reviewing "an EA/FONSI to determine whether an EIS should have been prepared, [the Court] must determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment."[35] Whether there may be a significant effect on the environment requires the agency to consider two factors: context and intensity.[36] Context examines the scope of the agency's action, while intensity relates to the severity of the impact.[37] "The relevant analysis is the degree to which the proposed action affects this interest, not the fact it is affected."[38]

---

[32] *Ecology Ctr., Inc. v. Russell*, 361 F. Supp. 2d 1310, 1312 (D. Utah 2005) (*aff'd in part, rev'd in part and remanded sub nom. Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183 (10th Cir. 2006)).
[33] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).
[34] 42 U.S.C. § 4332(2)(C).
[35] *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002).
[36] 40 C.F.R. § 1508.27.
[37] *Id.*
[38] *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,* 702 F.3d 1156, 1180 (10th Cir. 2012).

**A. Context**

Context evaluates the significance of an action in several contexts "such as society as a whole (human, national), the affected region, the affected interests, and the locality."[39] In the case of site-specific action, as here, "significance would usually depend upon the effects in the locale rather than in the world as a whole."[40]

The Project proposed logging and other vegetation treatments on approximately 5,000 acres of the DNF. As explained in the DN/FONSI, "[t]o put this in perspective, the [DNF] is composed of approximately 2 million acres of public land, almost half of which is in an essentially "unmanaged" condition, that is, wilderness areas, research natural areas, or inventoried roadless areas."[41] This Project includes treatments that constitute less than 0.5 percent of the DNF.[42] The effects of the Project on people in the area are limited to short term and minor effects to visitors to the area, and economic stimulus to local residents.[43]

Plaintiffs argue that this Project is similar to the Griffin Springs Project, which was enjoined by the Tenth Circuit.[44] Plaintiffs note similarities in the purpose, size, and proposed interventions of the two projects.[45] However, despite certain similarities in location and purpose, the context between these two projects varies greatly.

First, the Griffin Springs Project implicated an area more than three thousand five hundred (3,500) acres larger than this Project implicates.[46] Perhaps more importantly, the instant

---

[39] 40 C.F.R. § 1508.27(a).
[40] *Id.*
[41] AR at 33226.
[42] *Id.*
[43] *Id.* at 33226–27.
[44] *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183 (10th Cir. 2006).
[45] Docket no. 30, at 21.
[46] *Compare Ecology Ctr., Inc*, 451 F.3d at 1187 ("The Project area encompasses 11,835 acres . . ..") *with* AR at 33207 ("The proposed 8,306-acre Iron Springs . . . Project . . ..").

Project contains no Inventoried Roadless Areas or designated Wilderness Areas.[47] As the reviewing officer of the agency appeal stated, the Project "area is an area within the older Griffin Springs projects. However, the [Project] is not the Griffin Springs project. The [Project] was designed independent of the Griffin Springs project. A new stand analysis was conducted for the Iron Springs project, and the project has been subjected to a separate scoping process and environmental analysis."[48] The history and outcome of the Griffin Springs Project does not doom the instant Project.

**<u>B. Intensity</u>**

The Code of Federal Regulations identifies ten sub-factors to consider in determining the intensity of a proposed project. These factors include unique characteristics, the degree to which the effects on the human environment are highly controversial or are uncertain, and the degree to which an action may adversely affect an endangered or threatened species or its habitat. Plaintiffs argue that an analysis of these, and other, factors should have resulted in completion of an EIS. The Court disagrees.

The DN/FONSI addressed each of the relevant factors and determined that net effects of the Project would be beneficial, but not significantly so. The Project lowers the risk of a large-scale fire in the area.[49] Additionally, the Project will not have cumulatively significantly impacts nor establish a precedent for future actions with significant effects. The FS ensured that this Project would not affect any National Historic Places as none exist within or near the Project area. Two factors—whether unique characteristics of the geographic area were implicated and

---

[47] AR at 22862, 32207, 32913.

[48] *Id.* at 226.

[49] Plaintiffs argue that an EIS is required even when all significant impacts are beneficial. The Court need not determine whether an EIS is required for only beneficial impacts because it determines that there are both positive and potentially negative impacts to this Project, though none of them are significant. For an analysis of whether an EIS should be developed for only beneficial impacts, *see*, Shaun A. Goho, *NEPA and the "Beneficial Impact" EIS*, 36 Wm. & Mary Envtl. L. & Pol'y Rev. 367 (2012), http://scholarship.law.wm.edu/wmelpr/vol36/iss2/4.

whether the effects on environment are likely to be controversial—are closer calls and will be addressed separately.

**i. An EIS Is Not Required Because of Unique Characteristics.**

Plaintiffs argue that the area contains unique characteristics such that the Project would significantly affect the environment such that an EIS should have been developed. The FS analyzed whether unique characteristics of the geographic area were implicated and concluded, "No parklands, prime farmlands, wetlands, wild and scenic rivers or rivers that are eligible/suitable for designation, or ecologically critical areas are associated with the project area. Nor is the project area within a designated wilderness or an Inventoried Roadless Area."[50] While the DN/FONSI did not consider old growth ecosystems to be a unique characteristic, the FS did consider old growth ecosystems and even created "alternative A" based on a public comment related to old growth habitat. In addition, the Project is designed to maintain old growth habitat by reducing densities to make stands less conducive to beetle infestation.[51] Eighty percent of the stands treated in the Project will retain old growth characteristics following Project treatments.[52] The forest vegetation analysis prepared for this Project concluded that old growth ratios called for by the Dixie National Forest Plan would be exceeded post-Project in all watersheds in the Project area.[53]

In addition, Plaintiffs argue that the area should be considered unique because endangered or threatened species may be adversely affected by the Project. Endangered or threatened species found in the project area include the Mexican spotted owl and the Utah prairie dog. A biological assessment was conducted to document the possible effects of this Project and

---

[50] AR at 33227.
[51] *Id.* at 34112.
[52] *Id.* at 32919.
[53] *Id.* at 33091–92 (Tables 81 and 82).

the result of this assessment was that the Project "may affect but is not likely to adversely affect the Utah prairie dog."[54] Notably, the U.S. Fish and Wildlife Service concurred with the FS's findings on this point.[55] It was also determined that the Project may affect but is not likely to adversely affect the Mexican spotted owl and the project may impact individual bald eagles, flammulated owls, northern goshawks, and three-toed woodpeckers, but is not likely to cause a trend toward federal listing or a loss of viability."[56] There is ample information in the Administrative Record for the FS to determine that these impacts will not be significant.[57] Additionally, certain safeguards have been built into this Project to assist the animals within the area such that any impact will not be substantial.[58] Moreover, it is not the Court's role to challenge the FS on scientific matters.[59] The Court therefore defers to the agency on this point.

**ii. An EIS Is Not Required Due To Controversy.**

Controversy in the NEPA context "does not mean opposition to the project, but rather a substantial dispute as to the size, nature, or effect of the action."[60] Additionally, "controversy is not decisive but is merely to be weighed in deciding what documents to prepare."[61] Plaintiffs

---

[54] *Id.* at 8613.
[55] *Id.* at 14731.
[56] *Id.* at 32994.
[57] *See, e.g.*, *id.* at 14732, 32925.
[58] For example, if new raptor nests are found within or adjacent to the Project area, a buffer will be placed around the nest; If goshawk nests are found, the requirements of the DNF Forest Plan will be followed. In addition, a 350 foot no-treatment buffer zone will be implemented around any active Utah Prairie Dog colony. Timing restrictions will also be put in effect if prairie dogs are observed above ground and will be in effect until they have gone underground for the winter. Finally, Project implementation will cease "if any sensitive species is discovered within or adjacent to the project area that has not been addressed within the environmental analysis until an assessment can be made to determine the impact and potential adverse effects to the species." AR at F33215.
[59] *Utah Environmental Congress v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) ("Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.").
[60] *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1181 (10th Cir. 2012) (citation omitted).
[61] *Id.* (citation omitted).

argue that the Project is controversial because the efficacy of timber harvest to address beetle kill is "highly controversial."[62]

Even if the efficacy of timber harvest for the purpose of addressing beetle kill is highly controversial, addressing beetle kill is only one of six stated reasons for the Project.[63] The Project is also intended to address tree density and age/class diversity. It is designed to restock spruce/fir in certain areas, address the over-maturity of aspen, and ensure aspen success. In addition, the FS desired to clear downed material and address stand densities to lower the risk of catastrophic fire. Plaintiffs do not argue that these objectives are highly controversial. Therefore, even if one aspect of the Project—addressing beetle kill—were highly controversial, the other intended goals of the Project are not highly controversial.

The Administrative Record shows that the FS thoroughly considered both the context and the intensity of the Project and determined that the Project would not significantly affect the human environment. The FS's decision to prepare an EA rather than an EIS was not arbitrarily and capriciously made.

**2. The Project is not Improperly Tiered to the Goshawk Amendment.**

Plaintiffs next argue that that FS violated NEPA by "tiering" this Project to the Utah Northern Goshawk Project ("the Goshawk Amendment"). The DNF amended its Forest Plan to include the Goshawk Amendment in 2000. Plaintiffs' argument is that in 2000 the FS prepared only an EA for the Goshawk Amendment rather than an EIS. The Goshawk Amendment's FONSI and in fact its larger NEPA analysis was based—at least in part—on the limited temporal scope for the amendment. It was projected to be in effect for only four years until the Forest

[62] Docket no. 30, at 22–23.
[63] AR at 32911.

Plans in Utah were revised.[64] However, Forest Plans were not revised in 2004 and the Goshawk Amendment has been in place since 2000.

At first blush, Plaintiffs' argument appears to be a good one. One reason the Goshawk Amendment was not required to undergo a complete EIS was that it was only to be in effect for a short while, but with circumstances as they are, the Goshawk Amendment has been in place far longer than the FS expected. Notwithstanding the foregoing, in 2012 the FS conducted a scientific sufficiency review of the Goshawk Amendment in light of public comments the FS received regarding the duration of the Goshawk Amendment and the relevance of scientific literature developed since the Goshawk Amendment.[65] The FS determined that Goshawk Amendment "still represents the best available science for managing goshawk habitat on the Forest. Furthermore, implementation of the recommendations found in Reynolds et al.," the science on which the Goshawk Amendment is based, "is still the best available science to use on the Dixie National Forest."[66] The Project EA is consistent with the DNF and incorporates the conservation requirements of the Goshawk Amendment, as required. Given the Goshawk Amendment underwent NEPA analysis in 2000 and given the FS's 2012 scientific review, the Court finds this argument to be without merit.

**3. Plaintiffs Remaining Arguments Also Fail.**

Plaintiffs do not meet their burden of convincing the Court that the FS utilized stale science in analyzing habitat requirements for the Project or that the FS did not properly consider viability of management indicator species[67] in its Project EA.

---

[64] *Id.* at 4592.
[65] *Id.* at 18664–73.
[66] *Id.*
[67] The DNF Forest Plan designates certain management indicator species as species to monitor in order to evaluate how forest management practices are impacting all of the fish and wildlife species in the DNF. These species,

The DNF Forest Plan designates management indicator species to monitor and evaluate how forest management practices impact the fish and wildlife species in the DNF.  The Project area provides habitat for several forest management indicator species including the goshawk and the flicker.  Plaintiffs argue that the flicker is not an adequate representative of the habitat needs of all snag and cavity dependent species.  Further, Plaintiffs are concerned that surveys for the flicker show a downward population trend in the DNF and as such will be negatively affected by the reduction of snags in the Project area.  Plaintiffs also argue that the FS failed to take a hard look at the impacts of the Project on the three-toed woodpecker.  Finally, Plaintiffs argue that the science the FS relied on is no longer the best available science.

The Court is not in a position to determine whether the flicker is an adequate representative of the habitat needs of snag and cavity dependent species, and instead must defer to the DNF Forest Plan which designates it as such.[68]  Moreover, the FS determined that the area would maintain sufficient habitat to support a maximum population of flickers.[69]  "To maintain 100 percent habitat capacity for the flicker, 38 hard snags per 100 acres would be needed."[70] While the Project area currently has approximately 990 snags per 100 acres,[71] the project area will retain at least 200 snags per 100 acres.[72]  The Project area comprises less than 0.7 percent of potentially suitable habitat for the northern flicker in the DNF.[73]  There remain 1,196,146 acres

---

therefore, act as representatives for other species with similar habitat needs, and management impacts are evaluated by monitoring indicator species populations and habitat relationships.

[68] Plaintiffs have not brought a claim challenging the DNF Forest Plan itself and it is in that plan that the flicker is identified as a management indicator species.  AR at 3173 (designating the flicker as a management indicator species for "standing dead" habitat).

[69] AR at 32976.

[70] *Id.*

[71] *Id.* at 32974.

[72] *Id.* at 32976 ("With 200 to 300 snags per 100 acres representing all size classes above the minimum available on site, the Iron Springs Vegetation Improvement and Salvage Project would maintain habitat to support a maximum (100 percent) population of the northern flicker in the project area.").

[73] *Id* at 32974.

of suitable habitat for the flicker across the DNF.[74] The FS therefore determined—and the record supports—that "the reduction of dead trees within the treated acres will not affect the availability of nesting habitat."[75]

Similarly, the FS analyzed and disclosed the potential environmental consequences of the Project on the three-toed woodpecker[76] and similarly found that the Project would maintain habitat to support a maximum population of the three-toed woodpecker.[77] The three-toed woodpecker requires 59 snags per 100 acres and the area would retain 200 to 300 snags per 100 acres after the Project is complete.

Additionally, Plaintiffs argue that the FS relied on stale science in relying on the Thomas model, which set the number of snags per 100 acres that the flicker requires. The FS relied on Thomas to show that snags are not a limiting factor in the Project area either before or after the Project's implementation as appropriate snag numbers will be retained post-Project.[78] The FS considered the alternate scientific literature provided by the Plaintiffs and determined that the Thomas model was most directly applicable to the Project area in the DNF.[79] The record is replete with documents showing that the FS analyzed and disclosed the potential environmental consequences of the Project on the animals that make the Project area their home and determined that the Project would not substantially affect these species' viability in the Project area[80]

Finally, this Project is consistent with the DNF Forest Plan. Management area 7 of the DNF Forest Plan instructs, "management objectives will be directed toward . . . conversion of

---

[74] *Id.* at 18971.
[75] *Id.* at 32976.
[76] *Id.* at 32968–73.
[77] *Id.* at 32969.
[78] *Id.* at 1034.
[79] AR at 1030–44 (considering the alternate literature and finding that certain studies were "not directly applicable or site- specific to the habitat and treatments in the project," or were not directly applicable to the project area because of "habitat differences," forest differences, or other differences).
[80] *Id.* at 32968–78

old growth to young, thrifty stands, and management emphasis is on wood-fiber production and utilization of large roundwood of a size and quality suitable for sawtimber."[81] The Project may result in displacement of a relatively small number of animals including the three-toed woodpecker and the northern goshawk but the record shows no significant effect from the Project on the viability of any of these species. Even though some suitable habitat would be removed, the Project would lead to long term improvement and vastly reduce the risk of catastrophic fire to the area.

**CONCLUSION**

The voluminous Administrative Record illustrates that the FS reasonably determined that the Project would not have significant environmental impacts. Moreover, the FS properly relied on the DNF Forest Plan and adequately analyzed and disclosed impacts of the Project on management indicator, sensitive, and protected species. The Project is consistent with both the NEPA and the NFMA and is consistent with the DNF Forest Plan. The Court therefore AFFIRMS the FS's approval of the Project. The Clerk of Court is therefore directed to close this case.

IT IS SO ORDERED.

DATED this 29 April 2016.

Brooke C. Wells
United States Magistrate Judge

[81] *Id.* at 32915.